No. 98-568

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 246

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MARTIN REED SWAN,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,

In and for the County of Missoula,

Honorable Ed McLean, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

William F. Hooks, Appellate Defender's Office, Helena, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; Cregg W.

Coughlin, Assistant Attorney General; Helena, Montana

Fred R. Van Valkenburg, County Attorney; Kirsten LaCroix,

Deputy County Attorney; Missoula, Montana

Submitted on Briefs: July 20, 2000
Decided: September 14, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1 Martin Swan was convicted of deliberate homicide, by jury trial in the Fourth Judicial District Court, Missoula County. Swan appeals, arguing that he was denied his right to represent himself at trial. We affirm.

¶2 The sole issue on appeal is whether Swan was denied his right under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution to waive his right to counsel and represent himself at trial.

¶3 Early on the morning of March 1, 1997, the body of 19-year-old Ginny Hann was discovered lying on an ice-covered road near Missoula, Montana. Hann was completely naked except for the socks on her feet and a bra which was pushed up above her breasts. Her pants, shirt, boots, and jacket lay in a pile next to her body. The deputy county coroner determined that Hann had been killed at approximately 5 or 6 o'clock that morning.

¶4 Hann was 5 feet 2 inches tall and weighed 101 pounds. The State's medical examiner determined that she had died from asphyxia, and testified at trial that her death could have been caused by smothering. He further testified that physical findings were consistent with her having been overpowered by another person. He noted an injury over the girl's nose, a small abrasion at the corner of her mouth, and a depression in her neck. There were also scrapes and bruises to Hann's shoulder, right hand and wrist, and lower extremities. Vaginal injuries indicated that Hann may have been sexually assaulted within hours of her murder.

¶5 Law enforcement investigators learned that shortly after midnight on March 1, Hann had driven from her Missoula apartment to the K-Mart parking lot where, by prior arrangement, Martin Swan picked her up. Swan's neighbors joined the two of them at Swan's apartment until about 2 a.m., when they left Hann and Swan alone. In response to questions by law enforcement officers later that afternoon, Swan claimed that Hann had

driven to his apartment in her own car and that she had left his apartment shortly after the neighbors went home. However, officers discovered Hann's car still parked in the K-Mart parking lot.

¶6 Swan weighed 390 pounds and wears size 14W shoes. A shoe print found in the snow-packed roadway near Hann's body was consistent in size and tread design with the athletic shoes worn by Swan the night of Hann's murder.

¶7 Serological analysis of swabs taken from Hann's breast showed a high level of amylase, indicating the presence of saliva. Testing revealed a mixed DNA sample consistent with the DNA of Hann and Swan. Hairs found on Hann's nude body and on the sheet used to transport it to the crime lab were consistent with Swan's hair. Fibers found near and on Hann's body were consistent with carpet fiber in Swan's vehicle. Cheetos-type food chips were found in Hann's pubic hair and in the clump of fibers found next to her body, and a popcorn hull was tape-lifted from her bra. Investigators discovered bits of food chips, including Cheetos-type chips, on the carpet of the rear floor of Swan's vehicle. Popcorn hulls were also found in Swan's vehicle.

¶8 On March 20, 1997, the State of Montana charged Swan with the deliberate homicide of Ginny Hann. Swan pled "not guilty." Although he was provided appointed counsel, Swan wrote a letter to the presiding judge in May, asking permission to be allowed to use the law library to assist in his defense. At an omnibus hearing, Swan's counsel advised the court that she had no problem with her clients having access to the law library, but that she did have a problem with her clients filing motions before the courts pro se. The court denied Swan's request to be allowed to use the law library, and advised him that he could either have court-appointed counsel or represent himself, but he could not have it both ways.

¶9 Swan then filed a pro se "Motion to Dismiss Court-Appointed Counsel," in which he made several complaints about the effectiveness of his court-appointed attorney. He asserted that he "could be of more assistance to aide [sic] in his own defense if he was granted use of the law library." Swan asked to be allowed to proceed pro se with authority to use the law library, but added that if the court "deems that an attorney be assigned to this case," that his attorney "be dismissed and that new counsel be assigned as co-counsel and be there for advice, and to ensure proper court guidelines are followed."

¶10 At a July hearing, the court said it had received Swan's motion. The court pointed out

that only experienced counsel may be appointed in homicide cases. The following colloquy then ensued:

THE COURT: How do you expect to represent yourself in a homicide case?

SWAN: Actually, Your Honor, what I was hoping for was that different counsel would be appointed and that I-I also had access to the law library in my own defense.

THE COURT: Well, number one, if you want an attorney to represent you, you received that attorney that is appointed by the Court.

Number two, if you're represented by an attorney, you do not have access to the law library. You get primarily one or the other.

If you proceed on your own, you're going to be held to the same standards that an attorney would be held. Now, if you want access to-Primarily, you'll be given limited access to a law library, but you'll not be represented by an attorney. Do you understand that?

SWAN: Yes.

THE COURT: Do you want to represent yourself?

SWAN: Yes, I do.

The court then asked Swan's attorney for her comments. After stating she did not think Swan was capable of representing himself, she enumerated some of Swan's litany of complaints about her and what she had done to address those complaints.

¶11 The court and Swan next discussed Swan's complaints that the court was prejudiced against him and that the Information against him had not been read aloud in open court. The court read the Information aloud, then stated that it did not feel it had a prejudice against Swan and refused to recuse itself. The court also refused to allow Swan to proceed pro se. It stated that because of the nature and seriousness of the offense, experienced counsel was needed, and that it did not find that Swan was being denied any constitutional rights or receiving ineffective assistance of counsel. Finally, the court denied Swan's requests to be allowed to use the law library and to have other counsel appointed to represent him.

¶12 At an October arraignment, Swan was charged on an amended Information, in the alternative, with deliberate homicide via felony murder (while committing or attempting to commit sexual intercourse without consent). Attorneys Larry Mansch and Mark McLaverty appeared at that hearing on Swan's behalf. They advised the court that they had been substituted for Swan's former counsel and were now representing him. Swan pled "not guilty" to the amended charge.

¶13 Later that month, Swan and his counsel appeared in District Court to request a continuance of the trial date. Over the State's objection, the trial was continued until January 1998. Attorney Mansch then brought to the court's attention Swan's continuing wish to be allowed access to the law library at the jail, and his counsel's lack of objection to that. Mansch assured the court that all motions filed by the defense would be filed through counsel. The court removed the restriction prohibiting Swan from using the law library.

¶14 A jury trial was held on May 1 to May 12, 1998. The jury returned a unanimous verdict finding Swan guilty of deliberate homicide as originally charged. He was sentenced to a life term at Montana State Prison, without the possibility of parole. Swan appeals.

## Discussion

¶15 Was Swan denied his right under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution to waive his right to counsel and represent himself in these proceedings?

¶16 The Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee an accused the right to the assistance of counsel. This right, however, "does not prohibit a defendant from rejecting the assistance of counsel." *State v. Weaver* (1996), 276 Mont. 505, 511, 917 P.2d 437, 441. A person charged with a crime has the constitutional right to proceed pro se. *State v. Woods* (1997), 283 Mont. 359, 372-73, 942 P.2d 88, 96; *Faretta v. California* (1975), 422 U.S. 806, 819, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562, 572.

¶17 An accused who represents himself relinquishes many of the benefits associated with the right to counsel. For that reason, in order to represent himself, the accused must

knowingly and intelligently forego those benefits. *Faretta*, 422 U.S. at 835. Courts indulge in every reasonable presumption against waiver of the right to counsel. *See Brewer v. Williams* (1977), 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 440. This Court has stated that before a court may grant a request for self-representation, it must first determine that the defendant's waiver of the right to counsel is unequivocal, as well as voluntary, knowing, and intelligent. *State v. Langford* (1994), 267 Mont. 95, 99, 882 P.2d 490, 492.

¶18 Swan first argues that the District Court committed reversible error in basing its denial of his request to represent himself on the court's conclusion that he would not do so adequately. He correctly states that denial of the constitutional right to self-representation on the basis of such a conclusion constitutes reversible error. *See Faretta*, 422 U.S. at 835.

¶19 While it is true that the District Court expressed doubt about the wisdom of Swan's wish to represent himself, those comments were not made, and the court did not deny the request, until after Swan had clarified that what he actually wanted was to have different counsel appointed to represent him and to be given access to the law library to assist in his own defense. What the District Court did not say in making its ruling, but what is apparent from the record, is that Swan's was an in-the-alternative request for self-representation.

¶20 To determine whether a request for self-representation was unequivocal, we review the record as a whole. *Langford*, 267 Mont. at 101, 882 P.2d at 493. Contrary to his second argument on appeal, Swan was not unequivocal in expressing a desire to represent himself. Swan relies upon his oral answer of "Yes, I do" to the court's question, "Do you want to represent yourself?" at the hearing on his motion to dismiss his counsel. But in his written motion, Swan complained about the attorney appointed to represent him, asked the court to release her and allow him to proceed pro se, and "if this court deems that an attorney be assigned to this case then the defendant respectfully requests that [his appointed attorney] be dismissed and that new counsel be assigned as co-counsel and be there for advice, and to ensure proper court guidelines are followed." Indeed, when the District Court orally asked Swan, at the hearing, about his professed desire to proceed pro se, Swan made it perfectly clear that what he was "actually" "hoping for" was (1) to have different counsel appointed to represent him, and (2) to be allowed to use the law library. The court's rulings following its denial of Swan's request to be allowed to proceed pro se, on his requests to be appointed new counsel and to be allowed to use the library, make it clear that the court took these requests just as seriously as it did the request to be allowed to proceed pro se.

¶21 Swan cites two Ninth Circuit Court of Appeals cases which he contends support his claims. In the first, *United States v. Arlt* (9th Cir. 1994), 41 F.3d 516, the question of the defendant's mental competence gave rise to the trial court's denial of the request for self-representation. The Ninth Circuit clarified that if Arlt was competent to stand trial, he was competent to choose to proceed pro se. *Arlt*, 41 F.3d at 518. Additionally, and in contrast to the present case, there was "no evidence on the record that indicates that Arlt ever changed his mind about his decision to represent himself." *Arlt*, 41 F.3d at 523 n.5.

¶22 In *United States v. Hernandez* (9th Cir. 2000), 203 F.3d 614, the appeals court determined that Hernandez's guilty plea was involuntary because the trial court had denied his pretrial request to be allowed to represent himself and vacated his conviction. Hernandez had asked that new counsel be appointed to represent him; when that request was denied, he said he would like to represent himself. The appeals court stated that the fact that the request was conditional "has no effect on the strong evidence that the request was unequivocal," citing the absence of evidence that the request was impulsive or emotional and the trial judge's initial acceptance of the request as unequivocal. *Hernandez*, 203 F.3d at 622. Those factors are not present in this case. Swan changed the nature of his request almost immediately upon being questioned by the District Court, which clearly did not initially accept the request as unequivocal.

¶23 Also interesting to note in *Hernandez* is the court's acknowledgment that "[i]t may be true that in some instances the failure of a defendant to renew a self-representation request will provide support for the conclusion that the request was equivocal." *Hernandez*, 203 F.3d at 623. Here, Swan was by all indications satisfied with the services of his substitute counsel. Although he later renewed and was granted his request to be allowed to use the library, he did not renew his request to be allowed to represent himself.

¶24 As to the requirement that waiver of the right to counsel be unequivocal, we have stated:

> The requirement that a request for self-representation be unequivocal also serves an institutional purpose: It prevents a defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation. A defendant who vacillates at trial between wishing to be represented by counsel and wishing to represent himself could place the trial court in a difficult position: If the court appoints counsel, the defendant could, on appeal, rely on his intermittent requests for self-representation in arguing that he had been denied the right to represent

himself; if the court permits self-representation the defendant could claim he had been denied the right to counsel. See *Meeks*, 482 F.2d at 468. The requirement of unequivocality resolves this dilemma by forcing the defendant to make an explicit choice. If he equivocates, he is presumed to have requested the assistance of counsel.

*Langford, 267 Mont. at 100, 882 P.2d at 493, quoting Adams v. Carroll (9th Cir. 1989), 875 F.2d 1441, 1444.*

¶25 Although Swan asked to be allowed to represent himself, what he "[a]ctually . . . hop [ed] for" was that new counsel would be appointed to represent him and that he would be allowed to use the law library. The record as a whole reveals that Swan's request for self-representation was anything but unequivocal. We conclude, therefore, that the District Court did not err in denying that request. We affirm Swan's conviction of deliberate homicide.

/S/ J. A. TURNAGE

We concur:

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER